UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| AMY FOSTER, *Individually and as Administrator and Personal Representative for the Estate of Noah Foster, et al.*, | ) ) ) ) ) | No. 6:19-CV-164-REW-HAI |
| | ) | No. 6:20-CV-115-REW-HAI |
| Plaintiffs, | ) | ***Consolidated*** |
| | ) | |
| v. | ) | Rule 52 Memorandum of Decision |
| | ) | |
| UNITED STATES OF AMERICA, | | |
| Defendant. | | |

\*\*\* \*\*\* \*\*\* \*\*\*

This case arises from the tragic deaths of a pilot and his passengers following an aircraft accident on November 12, 2017. Plaintiffs Amy Foster, Individually and as Administrator and Personal Representative for the Estate of Noah Foster; Michael Foster, as Administrator and Personal Representative for the Estate of Scott Foster; Sara Whitaker, Individually and as Administrator and Personal Representative for the Estate of Doug Whitaker; and Kamryn Stewart, as Co-Administratrix of the Estate of Kyle Stewart (collectively, "Plaintiffs") sued Defendant United States of America on behalf of the deceased pilot and passengers, for the purported negligence of Air Traffic Control ("ATC") Specialist Reggy Richins at the Memphis Air Route Traffic Control Center (the "Memphis Center"). *See* DE 56 (Foster/Whitaker Amended Complaint); DE 63 (Stewart Amended Complaint).

After extensive litigation, the Court conducted a six-day bench trial. In accordance with Federal Rule of Civil Procedure 52, the Court issues the following Findings of Fact and Conclusions of Law. As set forth below and having considered the governing law and full record

(including witness testimony, the pertinent exhibits, and counsel's closing arguments), the Court **FINDS** that Richins did not breach his duty of care.  The United States has no liability in this case.

## I.       BACKGROUND

### a.     *Governing statute.*

In their Amended Complaints, Plaintiffs sued Defendant United States of America for negligence and gross negligence under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 (the "FTCA").  *See* DE 56; DE 63.  "Sovereign immunity generally bars claims against the United States without its consent."  *Kohl v. United States*, 699 F.3d 935, 939 (6th Cir. 2012).  However, "[t]hrough the FTCA, Congress waived immunity for certain tort claims."  *L. C. v. United States*, 83 F.4th 534, 541 (6th Cir. 2023).  Under the FTCA, the United States is liable for the negligence of an employee "acting within the scope of his . . . employment, under the circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  Pursuant to this statute, Plaintiffs filed a lawsuit against Defendant, alleging the negligence of ATC Richins, the FAA controller in contact with the plane piloted by Scott Foster at the time it crashed.  Federal district courts have exclusive jurisdiction in such cases.  *Id.*

### b.     *Stipulations of fact (from DE 186).*

At approximately 13:03 CST on November 12, 2017, a Piper PA 32-260 aircraft registered as "N3371W" departed from Everett-Stewart Regional Airport in Union City, Tennessee, bound for Lake Cumberland Regional Airport in Somerset, Kentucky.  Scott Foster was the pilot in command ("PIC") of the aircraft.  PIC Foster held a valid private pilot certificate but was not qualified to fly under Instrument Flight Rules ("IFR") or in instrument meteorological conditions ("IMC").  Three additional passengers were aboard the flight: Noah Foster, Doug Whitaker, and

Kyle Stewart.  Upon arrival to Somerset, PIC Foster was to bring Whitaker to his 40th birthday party, which was scheduled to begin at 16:00 CST.

PIC Foster radioed the Memphis Center R07 controller at 19:12:21 UTC,[1] and requested radar flight following service.  At 19:49:47 UTC, while cruising at 5,500 feet, PIC Foster first contacted ATC Richins, thus initiating the critical exchange between Foster and Richins discussed in greater detail below.  At that time, ATC Richins was working at the R41/40 desk position at the Memphis Air Route Traffic Control Center.  At 2008:58 UTC, PIC Foster made his last radio communication: "we're going down seven one whiskey seven one whiskey going down seven one (unintelligible)."  PIC Foster lost control of N3371W, causing the aircraft to overspeed and leading to a partial in-flight breakup of the aircraft.  All persons on board the aircraft died as a result of the accident.  This case concerns the interactions between Foster and Richins in the minutes prior to the crash.

c.    *Procedural history.*

The Foster/Whitaker Plaintiffs filed their initial complaint on July 11, 2019.  *See* DE 1 (Complaint).  Plaintiff Stewart filed her initial complaint on June 1, 2020.  *See Stewart v. United States*, Case No. 6:20-cv-115-REW (2020), DE 1 (Complaint) [hereinafter *Stewart* Action].  The Court consolidated the actions in October 2020.  *See* DE 31 (Consolidation Order); *see also Stewart* Action, DE 15 (Consolidation Order).  All plaintiffs amended their complaints in early 2021.  *See* DE 56; DE 63.  In their Amended Complaints, Plaintiffs brought negligence and gross negligence claims against Defendant.  *See* DE 56 ¶¶ 97–106; DE 63 ¶¶ 97–106.  Plaintiff Amy Foster also sought a loss of parental consortium claim for the loss of her child, decedent Noah

---

[1] The Court chooses to express the times in UTC to best align with the official transcript of the interaction. *See* Joint Exhibit 2; Joint Exhibit 3.  UTC has a +6 hour relationship with CST.

Foster.[2]  *See* DE 56 ¶ 107.  After extensive litigation, fact discovery closed on April 30, 2021, and expert discovery closed on November 16, 2021.  *See* DE 33 (Order Amending Discovery Deadlines); DE 77 (Order Amending Expert Discovery Deadlines).  On January 7, 2022, Defendant moved for summary judgment against Plaintiffs.  *See* DE 92 (Motion for Summary Judgment).  The Court largely denied the motion on September 30, 2022, but found that the evidence did not support a gross negligence claim.  *See* DE 117 (Summary Judgment Order & Opinion) at 20.  The Court accordingly dismissed the gross negligence claim, leaving the negligence claim (and the derivative loss of consortium claim) for resolution at trial.  *See id.*  The Court set the matter for a bench trial, and prior to trial, the Court resolved various pretrial evidentiary motions, including motions requesting the exclusion of certain experts.  *See* DE 123 (Pretrial Order).[3]  Following a trial continuance, *see* DE 179 (Order Granting Continuance), the matter proceeded to trial beginning on February 26, 2024, *see* DE 187 (Order Setting Trial).

> d.      *Bench trial.*

The bench trial occurred over the course of six days (February 26, 2024; February 27, 2024; February 28, 2024; February 29, 2024; March 4, 2024; and March 5, 2024).  Each side had a full and fair opportunity to present proof and challenge counter proof.  Plaintiffs' proffered testimony consisted of six fact witnesses, five expert witnesses, and one expert rebuttal witness.  Three fact witnesses and one expert witness testified via deposition.  Defendant presented five expert witnesses.  In total, the Court admitted 42 joint exhibits, 11 plaintiffs' exhibits, and 15 defense

---

[2] Plaintiff Sara Whitaker also brought a loss of consortium for the death of her husband, Doug Whitaker, but later dismissed that claim.  *See* DE 56 ¶ 110; DE 65 (Order Granting Joint Motion for Dismissal).
[3] *See also* DE 171 (Order Denying Motion to Exclude Expert Orloff); DE 173 (Order Denying Motion for Conflict of Law Determination); DE 180 (Order Largely Denying Motion to Exclude Expert Copley); DE 181 (Order Granting in Part and Denying in Part Plaintiffs' Pretrial Evidentiary Motions); DE 182 (Order Denying Motion to Exclude Experts Turner and Norton); DE 183 (Order Sustaining in Part and Overruling in Part Defendant's Objections).

exhibits.  At the conclusion of the parties' cases-in-chief and Plaintiffs' rebuttal case, the Court heard closing argument on behalf of all parties.

i.    *Witnesses.*

Plaintiffs presented the following witnesses:

*Reggy Richins*.  Richins is the air traffic controller whose conduct is at issue in this action. Richins acts as an ATC Specialist at the Memphis Center.  He testified as to the operations of the Memphis Center, the technology used by ATC, the work duties of an air traffic controller, the workload of a controller, and his understanding of a controller's duties under Chapter 10 of the FAA Order 7110.65X Air Traffic Controller Manual [hereinafter the ".65 Order"].  Most critically, ATC Richins testified to the events of November 12, 2017, including his exchanges with PIC Foster, his interpretation of PIC Foster's statements, the rationale behind Richins's actions, his interactions with other aircraft during that period, and his knowledge of weather conditions for that day.

*Patrick Johnson*.  Johnson is a fellow air traffic controller at the Memphis Center.  Johnson testified as to a controller's standard work duties, including any weather-related obligations.  He also testified about the day of the accident, his presence that day, and his role in assisting ATC Richins after the accident.

*Kevin Lagaly*.  Lagaly is Plaintiffs' ATC expert.  Based on his expertise, Lagaly analyzed ATC Richins's performance during his interaction with PIC Foster, specifically assessing Richins's performance in accordance with the .65 Order.  Overall, Lagaly opined that Richins failed to comply with the .65 Order in a number of ways (*e.g.*, deficient weather dissemination, failing to advise PIC Foster of IFR conditions, failing to advise PIC Foster of icing conditions, and failing

5

to treat the situation as an emergency under the .65 Order, among other alleged errors) and that his failure to comply with the .65 Order resulted in the deaths of PIC Foster and his passengers.

*Daniel Schreiber*.   Schreiber is Plaintiffs' meteorology expert, who examined weather conditions for the aircraft's flight path leading up to the accident.   He testified as to the positioning of the clouds and cloud cover for the relevant time period.   Schreiber also provided his opinion regarding IMC coverage and when and where PIC Foster could have safely exited IMC and reentered VMC.

*John Bloomfield*.   Bloomfield is Plaintiffs' forensic engineering expert.   He opined that PIC Foster's loss of control of the aircraft did not result from any mechanical issues or any other aircraft failure.

*Dr. Michael Foster*.   Dr. Foster is a plaintiff in this action, as fiduciary.   He testified about the academic and professional capabilities of PIC Foster and Noah Foster.   He also testified as to the relationship between Noah Foster and his mother, Plaintiff Amy Foster.

*Linda Jones*.   Jones is Plaintiffs' vocational economics expert.   She testified regarding the loss of earning capacity for the decedents' estates in light of their work life expectancies and annual earning capacities.

*Charles Copley*.   Copley is Plaintiffs' rebuttal piloting expert.   He testified regarding how pilots view ATC, the services a pilot may expect from ATC, and the sufficiency of PIC Foster's pre-flight planning.   From his perspective as a pilot and based on his interpretation of the communications between ATC Richins and PIC Foster, Copley also testified about how he would have expected Richins to respond in this scenario.   Copley opined that if Richins had declared an emergency and provided proper assistance, PIC Foster's loss of control and the resulting accident could have been avoided.

*Shawn Hipsh*.  Hipsh's testimony was presented via deposition.  Hipsh is an operational supervisor for air traffic controllers at the Memphis Center, and he was an air traffic controller at the Center at the time of the accident.  He testified generally about ATC training, an air traffic controller's responsibilities under the .65 Order, and the services provided by ATC.  He also testified regarding how air traffic controllers obtain and disseminate weather information, and how ATC responds when a VFR pilot is in IFR conditions.

*Richard Luck*.  Luck's testimony was presented via deposition.  Luck is a non-retained ATC expert witness.  He is or was an operations manager at the Memphis Center and was the on-duty manager at the time of the accident.  He testified as to his understanding of an air traffic controller's responsibilities under the .65 Order, including when an aircraft is in "distress" and when a VFR pilot is in IFR conditions.

*Sarah McVay*.  McVay's testimony was presented via deposition.  She was the ATC manager at the Memphis Center at the time of the accident.  She testified regarding ATC training, how air traffic controllers obtain weather information, the expectations of an air traffic controller under the .65 Order, and the proper ATC response when a VFR pilot is in IFR conditions.  She also testified about the process for handling a declared emergency and the internal quality control investigation into the accident.

*Travis Weber*.  Weber's testimony was presented via deposition.  Weber is a fellow air traffic controller at the Memphis Center, who was working the day of the accident.  He testified regarding ATC training, an air traffic controller's responsibilities under the .65 Order, how weather is depicted on the radar scope, and how ATC responds when a VFR pilot is in IFR conditions.

The defense witnesses were as follows:

*William Turner*.  Turner is the defense ATC expert.  He testified about the .65 Order, its requirements, the duties air traffic controllers are expected to fulfill pursuant to the Order, and the services, and prioritization of services, provided by ATC (*e.g.*, separation services, other required services, and additional services).  Turner further testified regarding the division of responsibilities between an air traffic controller and a pilot, particularly their weather- and safety-related duties.  He also opined regarding his interpretation of the communications between ATC Richins and PIC Foster.  Turner ultimately concluded that, in light of the relevant communications and the duties of ATC under the .65 Order, Richins did not cause or contribute to the accident.

*Lee Ray Hoxit*.  Hoxit is the defense meteorology expert.  He testified regarding the weather conditions and cloud cover along the flight path during the relevant time period, including where PIC Foster was most likely to encounter clouds along his route.  According to Hoxit, given the overcast weather and extensive cloud cover, PIC Foster's ability to conduct the entirety of the flight in VMC was unlikely.  Hoxit opined that, at the time PIC Foster made final contact with ATC Richins, the flight had proceeded to such deteriorated visibility conditions that PIC Foster could not exit the conditions without going through extensive stretches of IMC.

*Kenneth Orloff*.  Orloff is Defendant's aviation accident reconstruction expert.  Using available data (audio/transcript of communications, weather balloon data, expert reports, etc.), Orloff reconstructed the flight path over the duration of the flight.  He also created various graphics and charts to demonstrate the aircraft's altitude, airspeed, ground speed, direction, and pitch over time, as well as wreckage distribution and satellite imagery.  Orloff testified as to the extent of PIC Foster's pre-flight planning and his use of the ForeFlight pre-flight planning application (or lack thereof).  Based on his reconstruction, Orloff concluded that PIC Foster's lack of effective pre-

flight planning and relative inexperience caused the accident; due to these deficiencies, PIC Foster overstressed the aircraft, causing its in-flight breakup.

*Frank McGuire.* McGuire is the defense vocational economics and lost earnings expert. He testified regarding the loss of earning capacity for the decedents' estates in light of their work life expectancies and annual earning capacities.

*Vickie Norton.* Norton is the defense piloting expert. She testified about the Aeronautical Information Manual (the "AIM") and a pilot's duties and responsibilities under the AIM. She also provided her analysis of whether PIC Foster met the duty of care expected of a pilot. Overall, Norton opined that PIC Foster breached his duty of care for multiple reasons and in multiple ways: by failing to obtain proper pre-flight briefing, including seeking adequate weather information; by flying in doubtful conditions despite relatively low flight times and a lack of recency of flight experience; and by failing to appropriately and reasonably convey to ATC Richins that he was in an emergency situation.

ii.     *Exhibits.*

The key exhibits central to this decision are the NTSB Accident Report (Joint Exhibit 1), the full transcript of the exchange between ATC Richins and PIC Foster and all others in the timeframe (Joint Exhibits 2 and 3), the .65 Order (Joint Exhibit 4), the AIM (Joint Exhibit 5), the radar replay with audio (Joint Exhibit 8), flight path depictions (Joint Exhibits 10, 15, 17, and 20), and weather compilations (Joint Exhibit 28, and Defense Exhibits 126, 127, 129, and 132). Other admitted exhibits included images of the Memphis Center floor plan (Joint Exhibit 6); the flight following strip (Plaintiffs' Exhibit 2); photographs of the decedents and the crash site (Plaintiffs' Exhibits 15 and 18–19); various graphics and charts created by expert Orloff (Joint Exhibits 11–14, 16, 18–19, 21–27 and 29–36); court filings and discovery materials submitted in this case (Joint

9

Exhibits 37–42 and Plaintiffs' Exhibits 48–50); and tables showing expert McGuire's calculations of each decedent's earning capacity and lost earnings (Defense Exhibits 133, 136–143, and 145–146). The Court has considered the content, relevance, weight, and impact of each exhibit in the record.

## II.    LEGAL STANDARDS

As set forth above, under the FTCA, the United States is liable for the negligence of an employee "acting within the scope of his . . . employment, under the circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). "The extent of the United States' liability under the FTCA is generally determined by reference to state law." *Molzof v. United States*, 112 S. Ct. 711, 714 (1992). This means that the FTCA itself did not create any new causes of action. *Chomic v. United States*, 377 F.3d 607, 611 (6th Cir. 2004) (citing *Feres v. United States*, 71 S. Ct. 153, 159 (1950)). Instead, "[s]tate law is the source of a cause of action pursuant to the FTCA, although federal law or regulations may be relevant to the analysis." *Stout v. United States*, 721 F. App'x 462, 469 (6th Cir. 2018) (citing *Schindler v. United Stat*es, 661 F.2d 552, 560 (6th Cir. 1981)). Here, the Court assumes Kentucky law applies.[4]

In Kentucky, to establish negligence, a plaintiff must prove "that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003).

---

[4] Following the close of evidence, the Court heard oral argument from counsel regarding a conflict of law on the issue of damages and apportionment. The parties expressly agreed that, except for the apportionment mechanics and limitations (and possibly, as to recognition of a loss of parental consortium claim), there was no conflict between Tennessee and Kentucky law, and Kentucky law would properly apply. To the two areas of confliction, Plaintiffs maintain that Kentucky law applies, while Defendant argues that Tennessee law governs. Because, as set forth below, the Court finds no fault on Richins's part, it need not resolve the subsidiary conflict of law question. Therefore, since no conflict otherwise exists, the Court will apply Kentucky law, the parties' default.

"'Consequent injury' consists of what hornbooks separate into two distinct elements: actual injury or harm to the plaintiff *and* legal causation between the defendant's breach and the plaintiff's injury." *Id.* at 88–89 (emphasis in original). "Duty, the first element, presents a question of law. . . . Breach and injury, are questions of fact for the [fact-finder] to decide. . . . The last element, legal causation, presents a mixed question of law and fact." *Id.* at 89 (citations omitted). "The standard of care applicable to a common-law negligence action is that of ordinary care—that is, such care as a reasonably prudent person would exercise under the circumstances." *Wright v. House of Imps., Inc.*, 381 S.W.3d 209, 213 (Ky. 2012) (citation and quotation marks omitted).

KRS § 446.070 codifies Kentucky's negligence *per se* doctrine, which merely creates "a negligence claim with a statutory standard of care substituted for the common law standard of care." *Young v. Carran*, 289 S.W.3d 586, 588–89 (Ky. Ct. App. 2008) (citation and quotation marks omitted); *see* KRS § 446.070. § 446.070 provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." *Id.* In this way, § 446.070 "provides an avenue by which a damaged party may sue for a violation of a statutory standard of care if the statute in question provides no inclusive civil remedy and if the party is within the class of persons the statute is intended to protect." *Young*, 289 S.W.3d at 589 (citing *Hargis v. Baize*, 168 S.W.3d 36, 40 (Ky.2005)). However, the application of § 446.070 is limited to Kentucky statutes (and narrowly, state regulations) but does not extend to federal statutes or regulations. *See T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006); *see also Young*, 289 S.W.3d at 589 (citing *T & M Jewelry, Inc.*, 189 S.W.3d at 530).

The Federal Aviation Regulations ("FARs") govern the operation of airplanes by pilots. The FARs "have the force and effect of law." *Capello v. Duncan Aircraft Sales of Fl., Inc.*, 79 F.3d

1465, 1469 n.3 (6th Cir. 1996).  The AIM "constitutes evidence of the standard of care for all certified pilots in the aviation community." *Id.* (citation and quotation marks omitted).  Finally, the .65 Order "is an internal guideline issued to FAA controllers that governs air traffic controller conduct.  The [.65 Order] is not a statute or regulation." *In re Air Crash Near Rio Grande, Puerto Rico, on Dec. 3, 2008*, Case No. 11-md-2246-MARRA, 2016 WL 6916600, at \*4 (S.D. Fla. Oct. 24, 2016) (citing *Wojciechowicz v. United States*, 582 F.3d 57, 64 (1st Cir. 2009)).  Courts treat such an order as "an indication of the standard of care." *Wojciechowicz*, 582 F.3d at 64.

Together, these documents form "detailed sets of assumptions, customs and patterns of conduct shared by pilots and FAA flight assistants[.]" *Capello*, 79 F.3d at 1468.  "Rule one [of the FARs] makes it clear that the pilot in command, like the ship captain, has the ultimate responsibility for the safety of his plane and his passengers and must comply with the extensive body of regulations published by the FAA." *Id.* at 1469.  "The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." 14 C.F.R. § 91.3(a).  The pilot in command has "final authority, even over [] air traffic controllers." *In re Air Crash Disaster at JFK Int'l Airport on June 24, 1975*, 635 F.2d 67, 76 (2d Cir. 1980).  The pilot of a plane must also "be aware of those facts which are material to its proper operation and is charged with that which he should have known in the exercise of the highest degree of care." *Redhead v. United States*, 686 F.2d 178, 182 (3d Cir. 1982) (citing *Am. Airlines, Inc. v. United States*, 418 F.2d 180, 193 (5th Cir. 1969)).

The duties of pilots and FAA employees are concurrent.  *See Srock ex rel. Est. of Srock v. United States*, 462 F. Supp. 2d 812, 825 (E.D. Mich. 2006).  However, "nothing a flight service specialist does relieves a pilot of his duties and responsibilities." *Id.* at 825–26 (citing *Moorhead v. Mitsubishi Aircraft Int'l, Inc.*, 639 F. Supp. 385, 395 (E.D. Tex. 1986), *aff'd in part, rev'd in part*

12

*on other grounds*, 828 F.2d 278 (5th Cir. 1987).  "A controller's duty to warn does not, however, relieve the pilot of his primary duty and responsibility.  The pilot has a continuing duty to be aware of danger when he can gather adequate information with his own eyes[.]"  *Schuler v. United States*, 868 F.2d 195, 198 (6th Cir. 1989) (quoting *Spaulding v. United States*, 455 F.2d 222, 226–27 (9th Cir. 1972)).  "[C]ontrollers must be able to assume that pilots are complying with FAA regulations and understand their circumstances in the absence of a pilot request or other notice to the contrary[.]"  *Capello*, 79 F.3d at 1469–70 (citing *Biles v. United States*, 848 F.2d 661, 663 n.4 (5th Cir. 1988)).

Flight of aircraft occurs under two different sets of flight rules—Visual Flight Rules ("VFR") or Instrument Flight Rules ("IFR").  *Redhead*, 686 F.2d at 180 n.1.  "VFR flight is limited to fair weather flying. . . . The pilot under VFR flight rules may not fly through clouds or in weather in which the ceiling is low or the visibility is bad."  *Capello*, 79 F.3d at 1469 (citing 14 C.F.R. § 91.155); *see also Pierce v. United States*, 718 F.2d 825, 829 (6th Cir. 1983) ("It is undisputed that VFR pilots are not to fly into clouds if they can be avoided.").  As relevant here, in Class E Airspace that is less than 10,000 feet MSL, the FARs require a pilot to maintain three statute miles of visibility and a distance from clouds of 500 feet below, 1,000 feet above, and 2,000 feet horizontally.  *See* 14 C.F.R. § 91.155(a).  However, "'[n]o duty is imposed upon controllers to warn pilots not to enter IFR weather conditions without a clearance, nor are they required to foresee or anticipate the unlawful or negligent . . . acts of pilots.'"  *Peters v. United States*, 596 F. Supp. 889, 896 (E.D. Pa. 1984) (second alteration in original) (quoting *Baker v. United States*, 417 F. Supp. 471, 488 (W.D. Wash. 1975)).  That said, "the controller must assist even careless pilots who, based on the facts known to the controller, have placed themselves in a dangerous position."  *Biles*, 848 F.2d at 664.

13

## III.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

### a.  *Introduction*.

The Court has considered with care the entirety of the trial record.  This has included assessment of the objective proof along with the interpretations and opinions from the various expert witnesses, all of which were well-tested through rigorous cross-examination.  The Court weighed credibility and persuasiveness for each witness, considering the items any fact-finder would employ, including (for live and, if applicable, deposition witnesses) demeanor, consistency, recollection, potential bias, and how the testimony compared to other evidence found believable in the record and squared with common sense.  The Court treated deposition proof with the same dignity as live testimony, though that proof did not feature the revelatory parts of human presentation that come with a witness appearing in open court.

In this civil case, the Plaintiffs have the burden of proof on each claim element.  Thus, as to factual questions, Plaintiffs must prove the case by a preponderance of the evidence.

The Court found the Government's liability opinion witnesses (Norton, Turner, Orloff, and Hoxit) largely persuasive and credible.  Although they faced impeachment and bias endeavors, most of that was surface and ad hominem.  They all have appeared for the Government on prior occasions, sometimes in the same case; thus, the facile argument goes, they must be biased against a claimant and in favor of the Government.  A jury might struggle with perspective on such arguments, but the Court, though cognizant of the implication, simply weighed the proof as to individual credibility and the soundness, logic, and consistency of opinions derived from the record.  Does the United States employ hired guns, what Stewart's counsel called the "usual suspects" in an FAA case?  Or does it retain proven expert witnesses with exemplary experience, credentials, and teaching ability?  In this case, at least, the Court opts for the latter view.  This

14

derives largely from measuring the defense witnesses against the objective record and against the credibility of Plaintiffs' retained opinion sources. Simply put, and for reasons to be detailed, the Court found the Government's key sources (centrally, on piloting and ATC duties) more reliable, credible, substantive, and consistent—thus more persuasive—in this case.

Plaintiffs offered opinion testimony from a cadre of credentialed sources. Bloomfield, really a rule-out expert, was untouched and quite persuasive. Same, essentially, for Schreiber on weather topics. The Court will state its views as to Lagaly and Copley (and, as applicable, non-retained Luck) on specifics regarding ATC Richins and his performance. The Court found significant reasons to discount the proof from Lagaly and Copley, and Luck's testimony, presented by deposition text alone, had marginal impact because of the weakening freight of conditions and assumptions strewn through the critical questions he answered. Lagaly and Copley simply did not persuade the Court, but Turner and Norton did.

Importantly, the Court is careful not to judge the case with unfair hindsight. Though it is right to assess what PIC Foster and ATC Richins knew or properly should have known on November 12, 2017, it is not right to view the interactions against the granular determinations and post-crash analyses available only from forensic investigation and years of litigation.

The Court concludes that a duty of reasonable care burdened both PIC Foster and ATC Richins relative to the November 12 flight. This is plain under Kentucky law, as informed by the federal standards. Both were in circumstances that, by definition, created a foreseeable risk of harm from negligent action, so each had the duty to act in a reasonable manner with respect to their decisions and actions, or in some cases inactions, regarding the flight. *See T & M Jewelry, Inc.*, 189 S.W.3d at 531 ("Consideration must also be given to whether the harm to the plaintiff resulting from the defendant's negligence was foreseeable."); *Smith v. N. Am. Stainless, L.P.*, 158

F. App'x 699, 702 (6th Cir. 2005) ("In deciding whether a duty of care exists, Kentucky's courts consider whether the harm to the plaintiff resulting from the defendant's negligence was foreseeable.") (quotation marks omitted).  The existence of a duty of reasonable, or due, care is plain and essentially inarguable when it comes to the respective roles and performance of a pilot and interacting controller in the presented circumstances.  Negligence by either creates a foreseeable risk of harm; thus an ensuing duty of reasonable care applies.

Importantly, the Court will not treat any of the regulatory materials or guidance as defining, in a binding way, the existence or contents of an applicable duty in this case.  Kentucky's negligence *per se* statute, § 446.070, does not activate or apply on the basis of federal regulations or statutory enactments.  *See T & M Jewelry, Inc.*, 189 S.W.3d at 530.  As such, though the FAR provisions are indeed binding law qua federal piloting regulations, they do not dictate Kentucky's tort rubric.  Even more clearly, the sub-regulatory .65 Order and  AIM, while indeed being indicative on the contours of reasonable care, do not define, *per se*, the duties in this case.  The Court took all of the sources and testimony into proper account in limning duty and determining the existence or not of breach.

> b.    *Foster and legal conclusions on duty particulars.*

Based principally on Pilot Norton's testimony, the FAR obligations, and the AIM content, several particulars emerge with respect to Foster's duty(ies) of care pertinent to the flight.  The Court assigns them to pre-flight and en route portions of the journey.  As a pilot, and under Kentucky law, Foster had a duty to act with the care of a reasonable pilot under the circumstances.

Foundationally, Foster had a duty of reasonable care in deciding *whether* to fly on November 12.  This would surely include taking all reasonable preparatory evaluative steps— principally here being proper awareness and assessment of likely weather.  The FARs and the AIM

are harmonious and unequivocal here.  Thus, Foster had a federally imposed obligation to "become familiar with all available information concerning that flight."  14 CFR § 91.103.  The AIM implores, "urge[s]," pilots to "receive a preflight briefing and to file a flight plan."  AIM § 5-1-1(a).  A briefing, readily available to any pilot, is tailored to the particular needs of the proposed flight.  "The objective is to communicate a 'picture' of meteorological and aeronautical information necessary for the conduct of a safe and efficient flight."  *See id.* § (g); *see also id.* § 7-1-3(b) (encouraging operator briefing access).  Foster had available resources that would have armed him with all specifics on likely weather on the route, issues of potential concern, and whether a trained briefer would even recommend flight on the day.  (Norton opined that, in her experience, the recommendation would have been against flight).  With three passengers on the plane, and given the stark risk air travel poses to the public, Foster surely had an obligation to know and react with reasonable care to what a diligent inquiry would have provided him.

Foster also had a duty to fly safely.  This included avoiding "careless" operation that would "endanger the life or property of another."  14 CFR § 91.13(a).  Specific to his licensure and the particular flight at issue, Foster had the legal obligation to abide by VFR parameters set forth in federal law—specific distances and clearances prescribed in 14 CFR § 91.155(a) ("[N]o person may operate an aircraft under VFR when the flight visibility is less, or at a distance from the clouds that is less, than that prescribed [in the section.]").  This, in flight, would include the duty to acknowledge and yield to undue risk and thus turn around or abort the planned flight if and when Foster confronted a situation that reasonably precluded VFR flight to his intended destination.

Further, as pilot in command, Foster had ultimate control and final authority over his aircraft.  Per the FARs, "[t]he pilot in command of an aircraft is directly responsible for, and is the final authority as to, operation of that aircraft."  14 CFR § 91.3; AIM § 5-5-1(b).  He certainly

17

would, and reasonably should, have understood the proper role he undertook as pilot on the date in question.  This would include knowledge of resources available to him, the ATC role, and the obligations that would attend any perception of urgency or distress he encountered along the way.  Thus, the Court attributes to Foster, the PIC, a duty to reasonably know and implement the principles reflected in the AIM and the FARs.  This would encompass expected ATC interaction, weather awareness and currency, and the procedures applicable in a situation of distress or urgency.  Foster would or reasonably should have known, *e.g.*, that an ATC scope would not reveal clouds to a controller.  *See* AIM § 7-1-13(c) ("Clouds and fog are not detected by the radar."); *id.* § 7-1-14(a)(1) ("ATC systems cannot detect the presence or absence of clouds.").  He would have known the binding obligation to avoid IMC as a VFR flight.  He would have known to request assistance *immediately* upon developing any level of apprehension regarding safety.  *See* AIM §§ 6-1-2(a)–(b).

The Court also finds that Foster had a duty of reasonable clarity with respect to communications to ATC regarding his flight situation, needs, and requests.  The pilot-ATC relationship operates in a world characterized by concision, a crowded multi-party frequency, and precise nomenclature.  Much of the trial centered on the shared vocabulary in the community, as defined in the Pilot/Controller Glossary.  This specified, common lexicon appears in the AIM and again in the .65 Order.  AIM PCG-1; .65 Order PCG-1.  The point of definition is plain:  "This Glossary was compiled to promote a common understanding of the terms used in the Air Traffic Control system. . . . **Use of the Glossary will preclude any misunderstandings concerning the system's design, function, and purpose**."  *See id.* (both documents) (emphasis added).  Notably, the Glossary bolds and italicizes "[t]hose terms most frequently used in pilot/controller communications[.]"  *See id.* (both documents).  Words surely matter most when oral

communication is the primary mode, here really the sole manner, of conveying facts from a VFR flight to a scope-bound controller.  Thus, during interactions between Foster and ATC, there was a common expectation regarding terminology.

Further, Foster had a duty to abide by ATC instructions or to reasonably object or express concerns if those instructions were inapt, flew him into legal noncompliance or peril, or exacerbated any extremity he confronted.  The Court derives this obligation from the testimony of Norton, confirmatory testimony from Copley, and the ATC views expressed by Turner and confirmed, largely in this area, by Lagaly.

   c.    *Richins and legal conclusions on duty particulars.*

Richins likewise had a duty of reasonable care, to act as a reasonable controller would in the circumstances.  The principles and obligations within the .65 Order help inform this duty, as testimony from Turner and Lagaly compatibly recognized.  The law readily sees both pilot and controller as having concurrent and, depending on the scenario, overlapping duties of care. Certainly, Richins had a duty to use due care in effectuating airplane separation, *see* .65 Order § 2-1-2, in properly prioritizing the planes on his scope, in knowing about and communicating properly regarding depicted or known weather and other hazards to safe flight, *e.g., id.* § 2-6-1, and in responding appropriately to requests for assistance indicative of distress or urgency from airplanes within his sector, *see id.*, Chapter 10 §§ 1–2.  The Court relies on the .65 Order and the testimony of both Turner and, to a lesser extent, Lagaly, in determining these duties and their specifics in this case.  The general Kentucky duty of care, though, is what the Court applies—the care owed by a reasonable controller under the particular circumstances presented.  The Court draws specifics from the content of the .65 Order, the experts where persuasive, and the established

expectations relative to the participants operating within and controlling the National Airspace System (the "NAS").

      *d.*      *The Court finds as facts that Foster breached the duty of care, but Richins did not.*

The Court finds the following, with respect to breach:  PIC Foster breached the duty of reasonable care, in several respects, relative to the November 12 flight, resulting in the fatal crash. ATC Richins did not breach the duty of reasonable care.  Because ATC Richins did not breach any duty, Plaintiffs shall take nothing from the United States in this case.

The crash circumstances are heart-wrenching and reflect the gravest imaginable losses for the families before the Court.  Although the Court has deep sympathy and respect for the human cost, the evidence in this case points this fact-finder to only one conclusion—PIC Foster alone bears responsibility for the crash.  ATC Richins, in this circumstance, bears none.  The event undoubtedly was a tragic accident, but it was one wholly avoidable if Foster had, with reasonable care, executed the duties imposed on him as the pilot in command, the person with primary and final authority for safe flight.

Although there is no active claim against PIC Foster, a full analysis requires a reckoning of his performance.  Simply put, Foster never should have endeavored to make the flight when he did on November 12.  Once he did begin the flight, the deteriorating weather before him should have prompted an early return to the west and either landing at a clear airport or flight back to the point of origin.  The weather to the east offered no realistic hope of getting through without perilous IMC stretches.  Foster should have known this and would have known it if he had fully explored and stayed abreast of the weather, through ready sources, on the day in question.  Once in a situation of dangerously deteriorating visibility, Foster was not reasonably clear in his communications, and he did not accurately convey the true circumstances before him to ATC

Richins.  One will never know whether Foster made the decisions he did from unfounded confidence, inexcusable ignorance, or unjustified vulnerability to expectations that he get his group back home on time for a planned birthday celebration that evening.  The fatal rationale died with PIC Foster.  Although the families seek to blame ATC Richins and thus the United States, in whole or part, for the losses, the Court finds no basis to assign fault to the controller, who acted reasonably and in compliance with his duties.

> ### i.    *Particular findings relative to breach or lack of breach.*

The Court sets forth the three interactions between Foster and Richins, all from the transcript admitted at trial.[5]  The Court has listened to the actual taped sequences several times, has also watched the radar scope replay, and has contemplated the interaction.

The first interaction simply introduced Foster (N3371W) into Richins's handling in Sector R41:

```
1949:47     N3371W    and memphis center seven one whiskey is with you at five
                      point five

1949:54     R41       november three three seven one whiskey memphis center
                      roger bowling green altimeter three zero two six

1949:59     N3371W    three zero two six seven one whiskey
```

The second contact reflected that Foster had unilaterally determined to climb from 5500 feet "to maintain v f r."  Here is the exchange:

```
1957:44     N3371W    and memphis center seven one whiskey we're going to uh
                      vary our altitude up to maintain v f r seven one whiskey

1957:53     R41       and november seven one whiskey you're gonna uh climb

1957:57     N3371W    roger that we're climbing up to uh maintain v f r seven
                      one whiskey
```

---

[5] Richins had many different planes in his sector, and the transcript captures his communications with all the ones he addressed from 1944:00 through 2013:54.  The Court duplicates just the core communications.

```
1958:01    R41      roger november seven one whiskey no known or observed
                    traffic

1958:04    N3371W   roger that seven one whiskey
```

Notably, Foster acted consistently with his autonomy and self-determination as PIC of a VFR flight.  He selected his own altitude, showed cognizance of the need to adhere to visual flight rules, and showed facility with the argot.

Some eight minutes later, the third and final interaction began, here set out in its entirety, including communications involving other aircraft:

```
2005:54    R41      attention all aircraft hazardous weather information
                    atlanta center weather advisory one zero two valid until
                    two two zero zero zulu from uh volunteer to charlotte to
                    macon to montgomery to volunteer area of patchy limited i
                    f r ceilings below five hundred feet and occasional
                    visibility below two statute miles in fog and drizzle
                    expect conditions to continue and spread east through the
                    period

2006:20    N3371W   and memphis center seven one whiskey we hit some uh i m c
                    is there any vectoring to an altitude here with some uh
                    more visibility

2006:27    N827RJ   memphis center malibu eight two seven romeo juliett level
                    one six thousand

2006:35    R41      and november three three seven one whiskey uh stand by

2006:41    N3371W   roger that standing by

2006:42    R41      ah november seven one whiskey uh actually i'll i'll need
                    to get reports from other aircraft and uh i'll have to go
                    through nashville approach might be a minute trying them
                    maintain v f r

2006:54    N3371W   roger that maintain v f r at this time seven one whiskey

2006:57    R41      nashville east shelbyville

2007:00    BNA APCH nashville

2007:01    R41      uh jet linx ten twenty seven can you ask him if ah about
                    clouds uh in in his descent i have uh a v f r that's
                    encountering clouds and wants to steer clear uh wanna
                    know if he if he was clear of clouds in his descent

2007:17    BNA APCH okay i'll call you back

2007:18    R41      thanks r r
```

```
2007:20    R41       delta five sixty nine contact indy center one three two
                     point five two


2007:28    DAL569    three two five two delta five sixty nine


2007:42    BNA APCH  nashville nashville


2007:43    R41       nashville


2007:44    BNA APCH  jet linx is in the clear he said those layers starts about
                     four thousand feet below him


2007:48    R41       okay thank you


2007:49    BNA APCH  alright (unintelligible)


2007:50    R41       r r


2007:51    R41       and november seven one whiskey um can you make it how how
                     high can you go i have a jetlink that was inbound to
                     nashville that got um he said the tops were around eight
                     thousand or so

2008:00    UNKNOWN   nashville two seven line hinch mountain


2008:04    N3371W    we can head to eight thousand seven one whiskey


2008:07    R41       roger november seven one whiskey once you get on top it
                     should be clear uh he said that around uh eight thousand
                     or so it's uh good clouds


2008:16    N3371W    roger that we'll head up to eight thousand seven one
                     whiskey


2008:18    R41       roger


2008:35    R41       november eight two seven romeo juliett radio check


2008:38    N827RJ    i'm here i don't think you heard me a while ago i checked
                     in one six thousand


2008:43    JRT77     good afternoon jetright seventy seven flight level two
                     five two descending to cross gumma flight level two three
                     zero


2008:49    R41       and november eight two seven romeo juliett uh roger uh the
                     nashville altimeter three zero two eight and contact nash
                     uh memphis center one two eight point one five now


2008:58    N3371W    we're going down seven one whiskey seven one whiskey going
                     down seven one (unintelligible)
```

```
2009:07    HCH LO    nashville two seven hinch

2009:10    R41       and november seven one whiskey uh at your eleven o'clock
                     uh fifteen miles is at tompkinsville airport uh that
                     airport is uh louisville uh

2009:20    HCH LO    nashville two seven hinch mountain

2009:31    R41       november seven one whiskey radio check

2009:52    R41       and november seven one whiskey ah at your eleven o'clock
                     fourteen miles uh is tompkinsville airport

2010:03    JRT77     nashville approach jetright seven seven flight level two
                     three eight cross gumma flight level two three zero

2010:22    R41       november seven one whiskey radio check
```

Given the specialization of flight, the Court listened carefully and necessarily to the opinion witnesses. Whether a flight should occur, weather relevance, and the conduct of proper flight (and, correspondingly, proper controlling) are not matters within lay ken. Both sides presented piloting, ATC, weather, and reconstruction experts. The opinion witnesses, who diverged sharply in their piloting and ATC views, were critical to resolution of the case.

The Court credits the highly persuasive testimony from Pilot Norton. She has walked the full path from VFR pilot, to licensed instructor, to commercial pilot. Her approximately 17,000 hours of flight time simply dwarfed the experience of every other pilot in the case, though again she is well versed in the entire spectrum of flight experience and pilot performance. Norton was highly critical of Foster's lack of preparation for and poor decision making regarding the November 12 flight, problems worsened by his scant experience and very low flight hours, including paltry recent hours.[6] She strongly opined that a full briefing, something the proof showed is easily available to all pilots, would have recommended that Foster not fly that day.

_____

[6] The flight path intersection with restricted airspace did not contribute to the crash. However, the course chosen by Foster and the requirement of course correction resembles other lapses in preparation that proved far more consequential and deadly.

Adequate pre-flight weather evaluation by Foster should have led him to rethink the plan and choose ground transportation. Further, she called his decision to forge on in the face of worsening visibility a mere "guess" by him as to the safety of the flight and any real hope of VMC in the intended flight area. *See* Norton Testimony, Day 5, at 31.

As to the critical interaction with Richins, Norton was unsparing in her review. In her assessment, Foster simply inquired of Richins for an altitude with improved visibility. To this, Richins responded with an instruction to Foster, "maintain v f r," as Richins responsively sought a pilot report on cloud tops. Foster did nothing to disagree with this plan or signify a different need. Rather, he endorsed it, assuring Richins he would "maintain v f r at this time." When Richins provided the tops as being around "eight thousand or so," Foster confirmed an ability and intent to climb to that altitude. Foster did not ask for different information, did not convey any emergency, and did not draw Richins's attention to any concern about his status in the moment or relative to the intended altitude. Critically, as a pilot, Norton outlined Foster's obligation to object if Richins's instruction to "maintain v f r" was improper, problematic, or impossible to follow. Likewise, she endorsed the propriety of Richins parsing the 20:06:20 query, one that sought an altitude but injected the misused word "vectoring" into the phrasing. Per Norton, Richins properly disregarded the inapt surplusage as he sought to give Foster what Foster specifically asked for, "an altitude here with some uh more visibility." Norton was the strongest and most persuasive witness in the case.

Plaintiffs' piloting witness Copley saw things quite differently, as to the merits. He also is an experienced (50-year) pilot and has been an instructor for years, both before and following a long career in apparel. Copley was critical of Richins for not perceiving and declaring an emergency. He opined that Richins should have vectored Foster west, away from the cloud cover

and back to clearer air.  For several reasons, the Court found Copley unpersuasive on the points that mattered most.

First, Copley demonstrated confusion on the sequencing.  He seemed to collapse the second and third interactions during his testimony, mistakenly blending Richins's responses in interaction #3 with criticisms of Richins during interaction #2.  Further, Copley (and Copley alone, in this case) viewed interaction #2 as rising to the level of an emergency.  In the Court's recollection, no other witness for either side criticized Richins for the 19:57 exchange, where Foster merely alerted Richins that he, a VFR flight, had elected to climb in order to maintain VFR.  Copley's isolation and outlying position here undercut his persuasiveness, to this fact-finder.

Further, Copley seemed to take inconsistent positions on the weather that day, from a piloting perspective.  He praised the "good" job Foster had done pre-flight.  This was despite the fact that no one, in this record, can say just what Foster did to assess weather.  There is proof that Foster had a "ForeFlight" subscription, and that Foster accessed that app at unspecified times for unstated reasons on the day in question.  Further, the NTSB report quotes Foster's wife as saying that Foster always consulted and regularly continued use of that app.  This is the thinnest of reeds[7] and offers nothing concrete about what Foster did to educate himself about the weather and the likelihoods before or during the flight on November 12.  Even so, Copley (seemingly based only on his own review of airport departure and arrival conditions) lauds the pre-flight conduct and claims the day was good for flight.  Further in his testimony, though, Copley conceded that Foster was unlikely to make it to Somerset under VFR because of cloud cover between the point of departure and arrival.  Deciding and opining about weather based only on two points in the path strikes the Court as plainly inadequate under the piloting preparation standards established at trial.

---

[7] The report, containing Amy Foster's untested out-of-court statement, is admitted as Joint Exhibit 2.  Amy Foster did not testify in the case.

26

Finally, the Court found Copley's approach to be idiosyncratic and unduly subjective. Thus, Copley did reference or overtly rely on the FARs or the AIM in articulating his views. He, to some degree, derided the "book" rules in favor of practical workings and expectations in the skies. This included describing pilot and controller practices that do not square with the careful assignments, definitions, and responsibilities recorded for all to see in the AIM, the .65 Order, and the Part 91 regulations. His bases for opinion seemed to be anecdotal experiences he has had with and without student pilots beside him. Although the Court certainly views experience as a Rule 702 foundation, here, Copley drew almost exclusively from what he has seen controllers incidentally do or ask, not from objective training, an objective guide or source, or federal regulations. Copley takes positions contrary to AIM verbiage (*e.g.*, his cramped IMC definition) and seems opposed to the very idea that NAS safety depends on all participants sharing a common language and manner of communicating. He claims, for example, that controllers and pilots sometimes speak in code or language beyond the "books," rather than with clarity, to protect feelings or spare one side or the other unwanted accountability or scrutiny. He, perhaps in conflict, claims low-hour pilots view ATC, falsely, as equivalent to law enforcement, chilling candor. Needless to say, and with lives in the sky and on the ground at risk, there is no place in the NAS for thin skin, belief in non-existent sheriffs, or unbidden hand-holding. The Court considered Copley's views but found Norton far more credible and reliable as to opinions clarifying the subject matter of this case.

And what of the controllers? The Court focused closely on in-court testimony from ATC experts Turner (for the defense) and Lagaly (for Plaintiffs). Further, Plaintiffs played the deposition of Patrick Johnson and designated transcribed testimony from other Memphis Center

27

ATC personnel; the Court read and evaluated the designated testimony from Shawn Hipsh, Richard Luck, Sarah McVay, and Travis Weber.

Both Lagaly and Turner had long careers as ATC Managers in the system. Lagaly's is more recent, but Turner's compares favorably in terms of positions held, years of experience, and piloting/flight instructor background. On paper, the two are parallel and comparable resources for guidance on ATC duties and performance.

Lagaly, despite his solid credentials, was unpersuasive for several reasons and in several ways. First, through no fault of the witness, Plaintiffs' direct examination focused on taking Lagaly point-by-point through his Rule 26 expert disclosure. This presentation seemingly ignored that the report was not in the trial record or before the trier. As such, counsel walked Lagaly down a series of numbered, textual paragraphs that were not accessible to the trier, making the context unknown or hard to discern. This proved ineffective and confusing, as Lagaly loosely referenced specific points that may have been evident in the discovery, but were not adequately illuminated or supported through actual substantiating testimony. *See, e.g.*, Lagaly Testimony, Day 2, at 36, 42, 73 (Court: "You're asking him paragraph by paragraph. It's not in evidence so it's not something I have available to me.").

Second, Lagaly criticized Richins for his AIRMET familiarity and circulation, yet he could not offer specifics on what Richins had done or what Richins knew in terms of the weather bulletins. He conceded AIRMET availability to pilots and had no awareness of AIRMET issuance timing relative to Foster's departure. This was another conclusory instance where Lagaly depicted a duty without tying it persuasively to Richins's performance or this accident.

Third, Lagaly seemed to pick and choose inconsistently on language that mattered. Thus, he acknowledged that a vector is a heading assignment and does not relate to altitude. He expressly

28

distinguished a vector (a "turn or heading") from an altitude clearance or instruction (a "[d]escent or a climb").  *See* Lagaly Testimony, Day 2, at 56.  Yet, he still insisted that Foster had effectively invoked § 10-2-8 of the .65 Order when he asked for "vectoring to an altitude."  *Id.* at 130.  Further, although he acknowledged that IMC conditions, as a binary concept, mean those conditions out of VFR compliance (not necessarily a condition of a pilot actually being within clouds), he deems a reference by Foster to having "hit some imc" to mean Foster, definitionally, had been and *remained* "in a cloud."  *Id.* at 105.  Finally, and critically, although Foster expressly echoed Richins's instruction to "maintain v f r" as Richins sought a PIREP on the cloud tops, Lagaly did not in any way reflect or consider the full exchange, or immediately later remarks, in his analysis or opinion. Thus, he stopped the analysis before that important part of the dialogue between pilot and ATC. The Court simply is not persuaded that such a reading comports with this record or the actual way Foster and Richins interacted on November 12 or common sense.  By truncating the scrutiny, including Foster's direct employment of terms carrying significance, Lagaly also diminished the weight of his analysis.  This conclusion reflects that Lagaly later agreed that if he directed a pilot to maintain VFR, he would expect either compliance or notice from the pilot that he could not follow the instruction.

Turner, on the other hand, built his opinions on the full interactions and repeatedly referenced to objective sources (primarily, the FARs and the .65 Order) in girding his analysis.

Turner detailed the weather awareness and communication obligations of ATC, persuasively backing his views with citation to the .65 Order and by noting specific distinctions between alerts to precipitation, scope limitations relative to weather, and a duty to convey forecasts.  He detailed the AIRMET circulation duties, the PIREP solicitation duties, and the

relative priorities of ATC under the terms of the .65 Order.  The Court found his marshalling of duties and mastery of materials convincing and complete.

Per Turner, a pilot receiving an instruction must follow it or object.  When Foster and Richins had interactions #2 and #3, Turner opined that Foster in no way, for either instance, conveyed an emergency.  He described the pervasive judgment calls required in applying the .65 Order.  In his view, Richins responsibly reacted to Foster's inquiry and provided the sought information, which Turner interpreted to be only an altitude request.  The full dialogue, including Richins's interpretation and Foster's confirmatory reaction, informed Turner's opinions.  He rejected any duty on Richins's part to perceive or declare an emergency, and he focused on the import of Foster immediately affirming his current VFR maintenance as Richins quickly gathered a PIREP on cloud tops.

Certainly, Mr. Bolus, through a combination of word choice, volume, assiduous repetition, and confrontation, ultimately drew from Turner a concession that a request for vectoring is a request for radar assistance.  This, in isolation, could fit the scenario within aspects of § 10-2-8 of the .65 Order, which really is Plaintiffs' entire case in a nutshell.  As the fact-finder, the Court took notice and weighed carefully what Turner conceded, how he made the concession, and his overall testimony.  After the remark, Turner strongly testified about the need to assess the full picture, the entirety of the interactions, and the clarification that immediately accompanied Foster's 20:06:20 overture.  Vectoring may generally signify a request for radar assistance (as other witnesses would support), but the Court does not take Turner's back and forth with counsel, under dogged cross, as establishing that § 10-2-8 applied. Turner expressly refused to characterize the situation as conveying an emergency to Richins.

30

The Court agrees that the entirety of the exchange should inform the result.  An isolated testimonial wobble by Turner will no more decide the case than will Foster's obvious misuse of the known term "vectoring."  For consideration?  Surely.  Decisive?  Surely not.  Turner consistently and resolutely characterized the judgment inherent in controlling and perceived that judgment in the interactions between Foster and Richins.  Vectoring, when used accurately, does import radar assistance.  Vectoring, used in the context of an altitude clearance, introduces a non-sequitur, as every other qualified witness noted and as Richins immediately perceived in real time.

The Court finds Turner to be a credible and persuasive witness.  He clearly assessed what Foster conveyed to Richins and what Richins plausibly interpreted.  Critically (and this really is the core of it), when Richins reacted as he did, Foster confirmed Richins's interpretation.  Thus, Richins did not perceive Foster to actually be requesting vectoring or radar assistance.  Instead, Richins perceived that Foster again wanted to climb to reach clear sky, just as he had eight minutes prior.  Thus, Richins opted for the only source he would have to define the relationship between altitude and clear air, a PIREP.  He instructed Foster to "maintain v f r," and Foster confirmed the instruction and directly signaled his compliance:  "roger that maintain v f r at this time." Immediately upon delivering the PIREP, Foster confirmed his ability to climb and stated his intent to climb.  He did not alert Richins that he was out of VFR, that the climb would put him in IMC, or that the climb would create a safety concern.  Per Turner, Richins reasonably acted on what he knew and was told by PIC Foster, the only person capable of seeing the sky before the plane and carrying the final authority over the craft.

Plaintiffs have tried to make the case one of rote application of Chapter 10, and the Court has considered the theory.[8]  In Plaintiffs' view, Foster immediately conveyed an emergency when

_____

[8] Again, negligence per se does not apply, via a federal statute or reg, under KRS § 446.070.

he said "we hit some uh i m c is there any vectoring to an altitude here with some uh more visibility." Though Lagaly and Copley agree, Turner and Norton plainly and persuasively disagree.

Chapter 10, the Court must note, presents some application difficulties. It acknowledges the "infinite variety of possible" emergency situations, instructing controllers to use judgment in applying the Chapter when an emergency is believed to exist. *See* .65 Order § 10-1-1(d). Although the Chapter enumerates certain *defined* emergencies, *see id.* § 10-2-5, that list does not include this case. Sections 10-2-7 and 10-2-8 recognize that a VFR aircraft in "weather difficulty" may qualify. *See id.* §§ 10-2-7, 10-2-8. The structure of Chapter 10 is circular and somewhat confusing— presumably, Section 2 and Emergency Assistance only would apply when there is an emergency. However, § 10-2-8 makes that gating principle less clear, given its sequence and checklist. Undoubtedly, there is debate among the experts in this case over whether § 10-2-8 applied. The Court finds that it did not. In the Court's view, the question is whether Richins reasonably reacted to Foster's overture and reasonably deemed the matter not to be one of urgency or distress. Foster certainly never employed an automatic triggering word, per § 10-1-1; that is not required but would give certainty and should have been done if applicable. Did Foster communicate that he was in weather difficulty? Did he seek radar assistance as he encountered or was about to encounter IFR weather conditions? Did he convey urgency or distress?

Richins fairly did not treat Foster as seeking radar assistance through the use of the word "vectoring." He viewed Foster as seeking information to help him climb to clearer sky, just as he had climbed on his own previously. Richins knew that Foster had "hit some imc," ("some" being Foster's adjective) but he expected that Foster was not in IMC at the time. He showed (and tested) this view by instructing Foster to maintain VFR. Foster had many options (and duties) in the moment—he quickly could have alerted Richins to extant danger, to a contrary status, or to instant

32

weather difficulty.  He did none of that.  Instead, he repeated the instruction and confirmed the status by volitionally adding "at this time."  Again, when Richins delivered the PIREP information, Foster communicated his plan and ability to climb to "eight thousand," and never interjected that the instruction would take him into IMC or create  peril.  Looking back, one can see that Foster, for whatever reason, was opaque or resistant to candor.  That was not reasonably apparent to Richins in the moment.  Vectoring to an altitude is a null idea, what Plaintiffs' counsel called in separate examination an "oxymoron statement."  With every pilot and controller in the case distinguishing between the concepts of a vector and altitude, why would Richins be expected to treat that term, in context and the moment, as anything more than a mistaken misuse or language error?  The immediate instruction tested Foster's intent, and Foster clearly validated the lack of emergency and compliant VFR flight status "at this time."  To hold Richins responsible here would be to impute much more knowledge to him than was fairly available to a controller exercising reasonable care in the judgment-intensive[9] scenario presented.

Further, the other ATC personnel depict IMC for a VFR flight as a *potential* emergency that turns on details and particulars.  Thus, Sara McVay pegged the ATC duty, for a VFR pilot encountering a weather difficulty, as one to provide assistance "based on the pilot's request."  McVay Dep. 59:2–9.  Regarding the categorical nature of the circumstance, McVay resisted labeling any "VFR aircraft in weather difficulty" an emergency:  "It can be an emergency situation, maybe not always."  *See id.* at 61:1–6; *id.* at 61:12–13 ("[T]here's a lot of factors involved in that

---

[9] The Court does view the .65 Order as calling for judgment.  Certainly, the Order casts itself in that way. *Se*e .65 Order § 1-1-1.  Certain aspects of Chapter 10 are imperative, but whether a situation of this type actually presents distress or urgency undoubtedly, in this case at least, called for judgment and interpretation by the involved controller.  A pilot reporting that he hit (past tense) some (ambiguous degree) i m c and wanting vectoring to a clearer altitude is hardly a black and white case for § 10-2-8, contrary to Lagaly's rigid view.  The application argument simply vanishes with the immediately following exchanges between Foster and Richins, which communicate confirmation of no emergency and a safe, intended plan to climb.

so it is possible.").  Travis Weber agreed that the .65 Order requires that ATC use its "best judgment" in applying the terms and principles of the Order.  Weber Dep. 60:5–61:18.  He stressed the expectation that a VFR flight maintain VFR:  "I'm counting on him to fly visually, so what he's seeing may be different from what I'm seeing."  *Id.* at 96:3–7.  Richard Luck got significant attention during the summary judgment phase, and the Court again looked with care at his deposition.  There, Counsel Skinner repeatedly endeavored to box Luck in on application of § 10-2-8 to the November 12 events.  In the end, the Court finds the effort ineffectual and unpersuasive.  The Court has read and re-read the pivotal deposition sections and can only conclude that Luck never answered with clarity, and certainly not in parallel to the facts of this case.  First, Luck resisted any categorical answer on a VFR aircraft merely conveying it had encountered IFR conditions.  *See* Luck Dep. 134:6–22.  The questions often injected hypothetical conditions not factually representative of this case.  *See, e.g., id.* at 134:24–135:10 (predicate included pilot saying he's a "VFR only pilot"); *id.* at 135:25 ("lot of variables in there"); *id.* at 136:19–21 (couching answer as "if I found out that he was indeed in IFR conditions").  Further, the questions often were compound, asking the witness to give one answer to alternative predicates.  *See id.* at 130:4–23 (the entire question on that page).    Luck mattered at summary judgment, but in the context of a fulsome record, his murky and contingent views have little impact on the fact-finder.  *See also* Hipsh Dep. 35:22–36:3 (describing "clouds" as "[n]ot necessarily" dangerous to a VFR pilot).  Likewise, Patrick Johnson, by video deposition, testified his focus, for a VFR flight encountering IMC, would be to discern pilot intentions, whether the pilot intended to climb above or turn from IMC.  That, in essence, is what Foster conveyed to Richins in his request.  Plaintiffs, notably, did not really cite to or reference the deposition proof in closing argument to the Court.

The deposition proof does little to burnish Plaintiffs' case and little to erode the views of Norton and Turner.

The Court ends with its consideration of Richins himself, the first witness in the case. The Court found Richins to present as a competent, knowledgeable, and capable controller. He demonstrated facility with the technical tools of his craft and deep awareness of the .65 Order provisions. He expertly described the radar replay, detailing his management of the many duties and priorities across his scope during the period in question. He discussed weather protocols, the lack of depicted weather that day, and his attention to the need for familiarity and awareness. As to the critical interactions with Foster, he calmly described and characterized the events. He defended his interpretations, the reasons for soliciting the tops PIREP, and his reliance on Foster's words and demeanor in gauging the situation. In the circumstance, resisting hindsight and only judging Richins on what was reasonably presented to him and the participants' corresponding roles, the Court simply sees no failure or fault.

The Court, based on the full record, finds that Richins acted reasonably and fulfilled his duty of care relative to Foster and his flight. Notably, Plaintiffs have the burden of proving this case. So where there is not proof, the Court views the matter adversely to Plaintiffs. Where there is contested proof, the Court gauges whether Plaintiffs have proved a matter as being more likely true than not true.

First, no proof exists to show that Richins was not adequately informed about relevant weather. He got a briefing at the start of his shift and properly distributed HIWAS alerts, including the alert just before the 20:06:20 contact (an alert the parties agree has no relevance to this event). Per Turner, Richins hit the PIREP frequency requirement. Lagaly had criticisms regarding AIRMET circulation, but the Court sees no empirical basis for characterizing Richins as unfamiliar

with the weather conditions or as noncompliant with his weather-related duties.  Richins confirmed the lack of any depicted weather pertinent to his interactions with Foster.  In argument, Plaintiffs distanced themselves from any claim that dated or earlier AIRMETs impacted the parties' conduct.

Second, Richins properly balanced the planes on his scope throughout the relevant period. There has been some attention given to the R41's efforts to locate the "six Romeo mike" plane. The Court sees that effort as wholly consistent with ATC's primary duty of separation.  That plane was headed toward Chattanooga at an altitude that would soon become very problematic.  Richins juggled his full scope and also focused on raising that plane.  There was nothing about the Foster flight, to that point, that called for additional attention, and Richins ran his full scope with organization and aplomb.[10]  The Court audited and rewatched the full radar replay.

Third, Richins properly interacted with and responded to Foster between 20:06:20 and 20:08:16.  Rather than judging snippets, the Court has accounted for the full exchange.  Foster was PIC and had the duty to operate in compliance with VFR.  His 20:06:20 request was for "vectoring" to an altitude with more visibility.  Richins knew that vectoring related to radar and a heading, something inapplicable to altitude.  Nearly every witness drew this distinction.  In questioning ATC Luck, via deposition, Plaintiffs' counsel called Foster's usage "an oxymoron statement because you don't get vectored to an altitude."  Luck Dep. at 137:16–17.  So what did Richins do? He ignored the obvious malapropism and pursued what he reasonably read Foster to be seeking— the cloud tops, where the sky would be clear.

---

[10] Plaintiffs, mostly counsel for the Foster/Whitaker Plaintiffs, suggested that Richins was inattentive to his scope.  The Court rejects this.  Post-hoc details on the flight path offer ways to analyze what happened, but the Court finds that Richins had no duty to tend to the second-by-second granular (and in the moment, unremarkable) changes on his scope.  Foster said he intended to climb at 19:57, and he did climb.  Further, though Foster likely navigated around a very tall cloud, as Joint Exhibit 17 and the 14:00 to 14:06 (thus 20:00 to 20:06) path depicts, Richins got no word from Foster about that.  Indeed, in the whole period between 19:58 and 20:06, Foster did not contact Richins at all.

Richins interpreted Foster's query and immediately conveyed that interpretation to Foster, telling Foster he would need some time to get the PIREP. He concluded with the instruction "maintain v f r." Foster responded with unimpeachable clarity—"roger that maintain v f r at this time seven one whiskey." To Richins, Foster was a) confirming the instruction and b) confirming his ability to comply. Foster did not reply "unable," did not correct Richins's reading, and did not object that he in fact was not in "v f r at this time." Richins can only read his scope, not the pilot's mind. Foster did nothing to educate Richins that what Foster actually confronted was the gravity of unavoidable clouds.[11] Richins had the right, absent notice, to assume Foster would follow the flight rules and standards that regulate air traffic.

The Court assessed the Pilot/Controller Glossary, again, the common operative language. "Roger" has meaning. "Maintain" has meaning. The Court is most persuaded against Plaintiffs' view (that Foster merely repeated what Richins said) because Foster added the qualifier "at this time." Richins specifically testified that he believed Foster had "hit" IMC (what Foster called "some imc") but no longer was in non-VFR status. Foster's report, "maintain v f r *at this time*," confirms Richins's empirical perception about status. Then, Richins broke to pursue the tops data and circled back. Foster, again, did not protest the plan, signal a different desire, or demur—he agreed that he could climb to eight thousand feet, and he confirmed his election to do so. Full stop. The Court finds that Richins acted reasonably in the way he interpreted and reacted to Foster's communications. He also complied with the .65 Order, reasonably judging the facts and providing the assistance sought by the PIC.

---

[11] Richins did convey, in the PIREPS solicitation, that he had "a v f r that's encountering clouds." He also, though, said the pilot "wants to steer clear." This fully squares with Richins's testimony, which is that he believed Foster had encountered IMC previously but was, at transmission, back in VFR and seeking a path above and clear of the clouds he perceived in his intended path.

As he did in many other instances that day, in terms of reasonable care, Foster breached his duty of reasonable clarity and transparency.  In truth, Foster was seconds from loss of controlled flight.  Looking now at the satellite and weather data, it stands to reason that, while Foster might have been moving between cloud layers and encountering some clear space, he likely was not in any position to comply with VFR.  Still, and this fact is not disputed, Richins could not know this from his scope.  Foster, on the other hand, should have known that the scope would be utterly no help in defining cloud cover.  The *Redhead* duty requires that Foster know all he reasonably should, using the highest degree of care.

Foster, the inarguable PIC, had final authority and the primary duty with respect to safe flight.  If Richins excusably misperceived the situation at the first overture—if Foster had failed to convey his extremity—then Foster had the duty to correct the misperception.  The AIM clearly describes a duty when a pilot first feels insecurity about safety.  If the matter is not registering with the ATC, the PIC must speak and must clarify.  *See, e.g.*, AIM § 6-2-1(b)(2) ("If continued flight in VFR conditions is not possible, the noninstrument rated pilot should so advise the controller and indicating the lack of an instrument rating, declare a *distress* condition") (emphasis in original); PCG "Air Traffic Clearance" (noting pilots "may also request clarification . . . any time a clearance . . . is considered unacceptable because of safety of flight. . . . THE PILOT IS RESPONSIBLE TO REQUEST AN AMENDED CLEARANCE if ATC issues a clearance that would cause a pilot to deviate from a rule or regulation, or in the pilot's opinion, would place the aircraft in jeopardy.").  These plain duties square with Norton's piloting testimony, including Foster's absolute obligation to be clear, candid, (even corrective) with Richins if Richins did not discern what Foster really meant.  Regrettably, and for reasons known only to him, Foster instead simply abided by Richins's responsive information on a potential climb to clear air.

It was Foster, of course, that originally used the phrase "maintain v f r" in the dialogue that day. He used it as his original reason to climb, back at 19:57. He understood the duty; he understood the meaning of the phraseology. "Maintain," is a term the Pilot/Controller Glossary bolds and italicizes, meaning it is one "most frequently used in pilot/controller communications." *See* PCG-1, PCG M-1. Thus, when Richins again employed the standard term from the Glossary, neither man had confusion—"maintain v f r" literally meant just that. Foster accepted and affirmed his currency with the instruction, "at this time."

The Court has no expertise in piloting or controlling, but as any juror would, the Court does have experience with people. The radar replay includes the audio from the shared frequency on November 12, and the Court has listened to the exchanges several times. Foster sounded the same at 20:06:20 as he did at 19:49:57 (interaction #1) and 19:57:44 (interaction #2). Even deep into interaction #3, Foster's tone and meter remained professional, steady, and level. Really, there is no variance in the pilot's voice until the last transmission, which has the unmistakable tenor of panic. Perhaps Foster was masterfully masking the truth to protect his passengers from anxiety. Perhaps he simply had preternatural calm as a trait. His performance and demeanor kept the facts from Richins, who rightly depended on Foster to convey his circumstances with accuracy. Nothing in Foster's tone belied the content or sincerity of the words he used, and those words did not register an emergency.

The Court rejects the formulaic approach pursued by Plaintiffs. Again, they want Foster's insertion of the word "vectoring" to be a talisman, automatically ripening the § 10-2-8 protocol and emergency checklist. The Court disagrees. Foster was not seeking a heading or navigational guidance by radar to clear flight, something both men knew Richins could not possibly give him from the limited radar scope. What he asked for was *altitude* information and the visual data only

39

another pilot's views could supply. Word play, abridged analysis (as from Lagaly), sympathy, or an inadvertent extraction from Turner might turn a jury's head. Not so with the Court, which considers every part of the record in reaching a result consistent with the law, the quality of proofs, and the evidentiary burdens.

The Court finds that ATC Richins did not breach his duty of care. Plaintiffs shall not recover from the United States in this case.

## IV.    CONCLUSION

For all of these reasons, Plaintiffs have failed to prove by a preponderance of the evidence that Richins breached his duty of care in providing ATC services to PIC Foster on November 12, 2017.

Scott Foster was a talented and accomplished person. Undoubtedly, he loved his son and had deep and enduring attachments to his friends on the trip that day. The terrible accident was not a moral failing by Foster but did result from a series of ill decisions, failures in preparation, and mistakes in judgment by him. Regrettably, Foster simply got himself and his plane in an avoidable circumstance that exceeded his abilities as a pilot; the consequence was four lives lost. The Court understands the human impulse to blame the controller, but judgments rest on facts and law. The matter warranted a trial, and the trial result is that Scott Foster alone was responsible for the November 12, 2017 accident.

The Court accordingly **FINDS** in favor of Defendant United States of America. The Court will enter a judgment consistent with this Memorandum of Decision.

This the 30th day of March, 2024.



Signed By:

*Robert E. Wier*

**United States District Judge**